274 N.J. Super. 349 (1994)
644 A.2d 134
LARRY D'ARIES & FRANCES D'ARIES, PLAINTIFFS-APPELLANTS,
v.
JEROME M. SCHELL, D.P.M. & FRANKLYN GERARD, M.D., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued May 31, 1994.
Decided June 28, 1994.
*351 Before Judges COLEMAN, MUIR, Jr., and LEVY.
Robert L. Martin argued the cause for appellants.
Jane S. Kelsey argued the cause for respondent Jerome M. Schell (Reiseman & Sharp, attorneys; Ms. Kelsey, of counsel; John R. Gonzo, on the brief).
Jeffrey W. Moryan argued the cause for respondent Franklyn P. Gerard (Connell, Foley & Geiser, attorneys; Mr. Moryan, on the brief).
The opinion of the court was delivered by COLEMAN, P.J.A.D.
The significant issues raised in this medical malpractice case are whether plain error occurred when the trial judge failed to instruct the jury (1) the defendant bore the burden of proving plaintiff Larry D'Aries's comparative fault and (2) that the evidence respecting plaintiff's health habits and failure to follow medical advice before and after the alleged malpractice could not be considered as evidence of the patient's fault under comparative *352 negligence principles. We hold both constitute plain error requiring a reversal.
The malpractice against defendant Jerome M. Schell, a doctor of podiatric medicine, is alleged to have occurred between January 2, 1986, and March 3, 1986, during his treatment of plaintiff's left big toe. Based on plaintiff's health habits and failure to follow medical advice, Schell contended plaintiff's comparative fault should preclude a recovery. A jury concluded that plaintiff and Schell were sixty percent and forty percent negligent respectively, requiring the entry of judgment for Schell. This appeal follows the denial of a new trial motion.

I
Plaintiff was diagnosed in the mid to late 1960s as having diabetes mellitus. When plaintiff first consulted with Dr. Schell in 1978, he was taking insulin daily to control diabetes. It is widely recognized that diabetes adversely affects the circulatory system in general and the lower extremities in particular. Plaintiff visited Dr. Schell because Everett O. Bauman, M.D., plaintiff's treating physician for the diabetes in 1978, recommended that plaintiff see a podiatrist. Over the next seven to eight years, plaintiff did not consult with a physician concerning his diabetes.
Plaintiff first saw Dr. Schell in April 1978 complaining of a toe infection. He treated the condition with Keflex, a broad spectrum antibiotic. Plaintiff also saw Schell on May 18, 1981, August 12, 1983, May 4, 1984 and March 5, 1985, for various toe infections which were treated with antibiotics. Those treatments are not involved in this case.
On March 7, 1985, plaintiff was apparently injured in an automobile accident and sought treatment from an internist, Dr. Joseph Salese. In addition to treating the accident injuries, Salese advised plaintiff that he needed to monitor his blood-sugar levels and control his weight because of his diabetes. Salese also ordered various medical tests including non-invasive "Doppler studies" of plaintiff's legs and feet to detect any circulatory *353 problems. Either Salese or Schell referred plaintiff to Dr. H. Stephen Fletcher, a vascular surgeon, for the Doppler studies.
Three Doppler studies were performed by Dr. Fletcher on April 16, 1985, and they indicated the need for an arteriogram to reveal the condition of plaintiff's circulatory system in his lower extremities. The arteriogram was performed on April 23, 1985, and it revealed plaintiff had a partial blockage of the femoral artery in his left leg between the groin and knee.
Armed with the result of plaintiff's arteriogram, Fletcher informed Salese that he recommended plaintiff undergo bypass surgery to improve blood circulation to his lower left leg. When plaintiff requested a second opinion, he was referred to defendant Franklyn N. Gerard, M.D., a vascular surgeon.
Gerard examined plaintiff on April 30, 1985. After studying x-rays and the arteriogram, he concluded plaintiff's arteries in both legs were significantly calcified and narrowed as a result of diabetes. However, he concluded bypass surgery was unnecessary at that point because plaintiff's chief complaints  leg pain and shortness of breath  could be eliminated by weight loss. This opinion was not involved in the claim against Gerard.
On May 14, 1985, plaintiff visited Salese again in connection with the diabetes who ordered additional blood tests and a stress test. Plaintiff, however, "didn't like Dr. Salese" so plaintiff did not show up for either of the tests. He also refused to be treated by Salese again. This no-show prompted Salese to advise plaintiff by letter that he was withdrawing as plaintiff's diabetes physician. He recommended that plaintiff quickly seek the care of another physician. The letter stated it was plaintiff's persistent refusal to follow Salese's medical advice and course of treatment for his diabetes that caused Salese to withdraw from the case. Following the withdrawal of Salese, plaintiff was once again without a diabetes doctor.
On September 5, 1985, plaintiff kept a scheduled appointment with defendant Gerard. Gerard conducted some non-invasive *354 tests of the circulation in plaintiff's legs and concluded the results were unchanged from the earlier tests. Consequently, Gerard reaffirmed his opinion that there was no present need for bypass surgery. Notably, when Gerard learned that Salese was no longer treating plaintiff for diabetes, he strongly recommended that plaintiff go to another physician to monitor his diabetic condition.
On November 4, 1985, plaintiff visited Dr. Ernest DeFazio, an internist, seeking treatment for his diabetes. DeFazio examined plaintiff but conducted no tests. DeFazio did, however, recommend diet and exercise to control plaintiff's weight. The record does not indicate whether DeFazio scheduled another appointment for plaintiff. It is certain, however, that DeFazio did not see plaintiff again until early March 1986, when plaintiff was admitted to a hospital.
In the meantime, on January 2, 1986, plaintiff went to Schell for treatment of an infection of the big toe on his left foot. Because Schell was unable to extract any fluid from the infected toe, he was unable to obtain a culture for testing to determine the most appropriate antibiotic to treat the infection. Schell did not apply a vaseline-based topical antibiotic ointment to the infected toe for fear that it would interfere with any possible fluid drainage. Instead, he treated the toe with an antiseptic solution and bandaged it. He also prescribed Keflex to combat the infection. There was a dispute as to when the next visit was scheduled.
Schell testified that it was his office practice to schedule follow-up appointments within a week when a patient has an infection. He testified that he must have scheduled such an appointment for plaintiff, but that plaintiff must have canceled it by telephone. Schell's appointment book, however, did not reflect the canceled appointment. For his part, plaintiff testified that Schell had not scheduled him to appear for a follow-up visit until twenty-six days later, January 28, 1986.
Schell also testified that plaintiff telephoned him on the evening of January 2, 1986, and angrily complained that he had spoken to another doctor who had contradicted Schell's diagnosis. According *355 to Schell, plaintiff refused to take the prescribed Keflex because it was too expensive. Schell testified that plaintiff's call led him to believe plaintiff would never return to him for treatment. Based on that belief, Schell advised plaintiff to consult with his diabetes doctor for blood-sugar testing and to place himself under the care of that doctor.
In contrast, plaintiff testified that he did not telephone Schell on the evening of January 2, 1986, or refuse to take Keflex. Indeed, plaintiff presented proof that he had Schell's prescription for Keflex filled on January 3, 1986.
On January 28, 1986, plaintiff again visited Schell at his office. Because plaintiff's toe was exuding a fluid at that time, Schell was able to obtain a culture sample which he later sent to a laboratory for analysis. Schell did not apply a topical antibiotic to the toe on this visit because he did not want to retard any possible fluid drainage from the situs of the infection. Schell cleaned and dressed the infected toe, and again prescribed Keflex. That prescription was filled on January 31, 1986.
There is disagreement whether Schell saw plaintiff on January 31, 1986. If he did, the medication was not changed. There is also a dispute whether an appointment was made for February 4, 1986, that was canceled by plaintiff. Plaintiff next visited Schell on February 10, 1986. On that visit, Schell noted no change in the condition of plaintiff's infected toe, which he again cleaned and dressed. By that time, Schell had received the results of the laboratory tests, which indicated that Ampicillin was the appropriate antibiotic to combat plaintiff's infection. Accordingly, Schell prescribed Ampicillin and plaintiff had the prescription filled shortly thereafter.
The next visit was on February 14, 1986, when Schell cleaned and dressed the infected toe and noted it was "slightly improved." This meant the infection was responding to Ampicillin, and the prescription was renewed. At the next scheduled appointment on February 21, 1986, Schell cleaned and dressed the infected toe, and again noted it was "slightly improved." According to Schell, *356 he reminded plaintiff to consult with his medical doctor concerning his diabetes.
There was a dispute as to whether plaintiff was given an appointment for February 27, 1986, which was allegedly canceled by plaintiff. The last visit with Schell was on March 3, 1986. Schell found the condition of the toe to be "markedly improved." Plaintiff, on the other hand, testified that his toe did not improve with the treatments. Throughout the period of the treatment with Schell, plaintiff was not under the care of any physician for his diabetes.
After the last visit with Schell, plaintiff contacted Dr. DeFazio's office and was seen by an associate. Based on that examination, gangrene of the big toe was suspected and plaintiff was hospitalized immediately on March 7, 1986.
Defendant Gerard was called in for a consultation during this hospitalization. Gerard recommended that plaintiff undergo another arteriogram, but plaintiff refused to do so. This refusal compelled Gerard to use the eleven month old arteriogram performed by Dr. Fletcher. Because of the limited amount of circulation at the ankle at that time, Gerard concluded plaintiff was not a candidate for vascular bypass surgery. This opinion forms part of the basis for the claims of malpractice against Gerard.
The toe was treated in the hospital with intravenous antibiotics over the course of his twenty-day stay. He was discharged from the hospital on March 26, 1986, when his condition was considered "improved." At the time of discharge, plaintiff was instructed to seek follow-up care with Dr. DeFazio. The doctor's records indicate plaintiff did not contact his office as directed.
Plaintiff was rehospitalized on April 18, 1986, with an initial diagnosis of "impending gangrene of the toe." Gerard was called in for consultation on the same day. Again, he concluded plaintiff was not a candidate for vascular bypass surgery. This opinion *357 formed the additional basis for the claim made against defendant Gerard.
The admitting diagnosis of gangrene of the toe was confirmed by x-ray on April 22, 1986. Plaintiff underwent a transmetatarsal amputation on April 23, 1986, which involved the removal of most of his left forefoot. The infection continued, however, and on May 7, 1986, plaintiff underwent a below-knee amputation. Plaintiff was discharged from the hospital on May 23, 1986.
In 1989, plaintiff was hospitalized with an infection of his right foot. During that hospitalization, toes on his right foot were amputated.

II
Plaintiff contends the jury charge constitutes plain error respecting his alleged contributory/comparative negligence in two respects. First, the jury was not instructed that defendant Schell bore the burden of proving plaintiff's alleged negligence and proximate cause. Second, the charge did not inform the jury how to properly use the evidence relating to the treatment of plaintiff and his action or inaction before January 2, 1986, and following March 3, 1986, as explicated in Ostrowski v. Azzara, 111 N.J. 429, 545 A.2d 148 (1988).

A.
The case was tried against Schell on the theory that he failed to render proper care to plaintiff while treating the infected left big toe between January 2, 1986 and March 3, 1986. Schell defended on the basis that he rendered proper care and that the amputations were caused by the natural progression of the diabetes, its complications and plaintiff's failure to follow recommended treatment instructions.
The entire jury instruction on whether plaintiff was negligent in not following recommended treatment advice was as follows:

*358 Now in addition to claiming that Dr. Schell was not negligent in the case in the care and treatment rendered to Mr. D'Aries, defendant contends that Mr. D'Aries was negligent in not complying with Dr. Schell's instructions during the period of time that he treated Mr. D'Aries. The period of time is longer but in terms of the particular matter that we're addressing here from January 2nd to 1986 through March 3, 1986. And it's up to you to determine whether or not Mr. D'Aries was or not complying with any instructions that you find Dr. Schell may have provided. If you find that if Mr. D'Aries was complying, then he may not be negligent. By the same token if you find that he was not complying, then he may be found negligent. If you were to conclude that Mr. D'Aries was negligent by failing to comply with Dr. Schell's instructions you must still determine whether or not his non-compliance was a proximate cause of the amputation ultimately underway.

B.
This case is controlled by Ostrowski, supra, where the facts are very similar to the present case. Ostrowski was a cigarette-smoking diabetic who went to a podiatrist complaining of pain in a toe. Id. at 432, 545 A.2d 148. The podiatrist advised the patient to see an internist for her diabetes and vascular condition. Id. at 433, 545 A.2d 148. The patient said she was seeing an internist who had referred her to a podiatrist to treat the sore toe. It turned out the patient had not been seeing an internist. Id. at 433-34, 545 A.2d 148. The podiatrist removed the toe nail to promote drainage. Thereafter, she saw an internist who advised her to stop smoking, which advice was ignored. Six weeks after the toenail was removed, a pre-gangrenous toe required the first of three unsuccessful bypass operations. The leg was eventually amputated below the knee. Id. at 435-36, 545 A.2d 148.
Ostrowski sued the podiatrist, claiming he committed malpractice when he removed the toenail without first consulting with the internist. At trial, the podiatrist was permitted to introduce evidence that during the pre-treatment period, the patient had smoked cigarettes and had failed to maintain her weight, diet, and blood sugar at acceptable levels. Id. at 435, 545 A.2d 148. Additionally, the podiatrist was permitted to introduce evidence of the patient's health habits following removal of the toenail, including her failure to observe diet and smoking advice. Id. at 435, 438, 545 A.2d 148. A jury found Ostrowski was fifty-one percent *359 at fault for causing her own condition, and the podiatrist was forty-nine percent at fault for removing the toenail without adequate consideration of the patient's vascular condition. Id. at 435-36, 545 A.2d 148. The Appellate Division affirmed the judgment disallowing any recovery.
The Supreme Court reversed because the jury instructions failed to properly inform the jury how to use evidence of the patient's poor health habits and her failure to follow recommended treatment instructions. The Court concluded that in our fault-based system of tort reparation, the patient's conduct must be divided into three categories in determining whether the patient shares any fault and whether the patient has satisfied the requirements of mitigation of damages. Id. at 436, 448-51, 545 A.2d 148. The three temporal headings under which the patient's conduct is to be examined are (1) the pre-treatment period, (2) the treatment period during which the alleged malpractice occurred, and (3) the post-malpractice period. Id. at 444-48, 545 A.2d 148.
The pre-treatment health habits, conduct or omissions of the patient should not be considered by a jury as evidence of fault under comparative negligence principles. Id. at 444-45, 545 A.2d 148. Such matters are germane to the issue of proximate cause exclusively. Id. at 445, 545 A.2d 148. Similarly, the conduct of the patient following the period of alleged negligent treatment may not be considered by the jury on the issue of comparative negligence. Id. at 437-38, 448, 545 A.2d 148. The patient's post-treatment negligence is relevant to the issue of damages. Finally, only the conduct of the patient and his or her omissions from the beginning of the pertinent treatment until the time of the alleged malpractice may be considered by the jury as evidence of the patient's fault under comparative negligence principles. Id. at 436-38, 448, 545 A.2d 148.

C.
Based on the evidence, the present case is particularly appropriate to apply the timeline approach outlined in Ostrowski *360 when considering plaintiff's conduct which is relevant to comparative fault and avoidable consequences. "Avoidable consequences ... comes into action when the injured party's carelessness occurs after the defendant's legal wrong has been committed. Contributory negligence, however, comes into action when the injured party's carelessness occurs before defendant's wrong has been committed or concurrently with it." Id. at 438, 545 A.2d 148. (Footnote omitted.) In other words, the doctrine of avoidable consequences affects only the question of diminution of damages; it has no impact on comparative fault (liability) issues. Id. at 442, 545 A.2d 148.
Under Ostrowski, the jury charge was deficient in several respects. The charge did not "cordon off the jury's consideration of [evidence relative] to either the pre-treatment or post-treatment period." Id. at 448, 545 A.2d 148. Simply telling the jury Schell contended plaintiff was negligent "in not complying with Dr. Schell's instructions during the period of time that he treated" plaintiff was grossly inadequate. While the instruction focused on the proper time period, it did not preclude the jury's consideration of pre-treatment and post-treatment evidence in arriving at its decision whether plaintiff was negligent and in determining the percentage of plaintiff's negligence. Much more was required in light of the extensive pre-treatment and post-treatment evidence introduced which presented a real "potential for jury misunderstanding of the repeated reference to plaintiff's failings." Id. at 449, 545 A.2d 148.
The substantial pre-treatment evidence which the jury might have considered as bearing on the issue of plaintiff's negligence included (1) his failure to consult with a physician about his diabetes between 1978 and 1985, as well as the period after he refused to return to Dr. Salese in May 1985 and until he went to Dr. DeFazio in November 1985, (2) the fact that he was overweight during the above periods, and (3) his failure to follow Dr. Salese's instructions. The post-treatment evidence which could have been considered on the issue of plaintiff's negligence consisted *361 of (1) two or more missed appointments, (2) refusal to take Keflex, (3) refusal to take an arteriogram and (4) his failure to make follow-up visits with Dr. DeFazio.
In this type of case, extraordinary precautions must be taken to make sure that the jurors properly limit their consideration of the pre-treatment and post-treatment testimony. See State v. Kelly, 97 N.J. 178, 216-17, 478 A.2d 364 (1984), (requiring limiting instruction when prior convictions are used to attack credibility); Fischer v. Johns-Manville Corp., 103 N.J. 643, 659, 512 A.2d 466 (1986), (requiring a limiting instruction to prevent jurors from considering proofs of a defendant's misconduct, relevant only on the issue of punitive damages, when deliberating on the strict liability claim). We conclude a limiting instruction was required concerning the use of the pre-treatment and the post-treatment conduct of plaintiff in much the same manner as that required by Evid.R. 51, now N.J.R.E. 407, when evidence of subsequent remedial or precautionary measures is relevant to some fact in controversy. That rule requires the jury to be informed that evidence admitted solely for another purpose may not be considered on the issue of negligence or culpable conduct on a particular occasion. Ryan v. Port of New York Authority, 116 N.J. Super. 211, 281 A.2d 539 (App.Div. 1971).
We are persuaded that Ostrowski contemplated a limiting instruction pursuant to Evid.R. 6, now N.J.R.E. 105. Unquestionably, all of the evidence was properly admitted. But this relevant evidence was admitted for special or limited purposes. Under these circumstances, Evid.R. 6 directs that "the judge shall restrict the evidence to its proper scope and instruct the jury accordingly." The purpose of a limiting instruction is to assure that evidence will not be improperly applied beyond the specified purpose by the jury. State v. Cofield, 127 N.J. 328, 605 A.2d 230 (1992). Indeed, Ostrowski reversed and remanded because the instructions did not educate the jury how to properly use the evidence which fell into the three categories previously discussed. On the remand, the judge was informed "the jury should be *362 instructed how to use the information contained in relevant admissible medical records." Ostrowski v. Azzara, supra, 111 N.J. at 451, 545 A.2d 148.

D.
Even though there was no objection to the jury charge, we are entirely satisfied the instructions had the clear capacity to bring about an unjust result. R. 2:10-2. This was a close decision by the jury in that it apportioned fault at 60/40. With a proper instruction, the percentage could easily have been different and favorable to plaintiff. The jury received no guidance on how to use a substantial amount of damaging evidence against plaintiff. Beyond that, the jury was not instructed that defendant Schell had the burden of proving plaintiff's negligence and of apportioning the harm to plaintiff caused by plaintiff's negligence. Ostrowski v. Azzara, supra, 111 N.J. at 438-39, 545 A.2d 148; Dziedzic v. St. John's Cleaners & Shirt Launderers, Inc., 53 N.J. 157, 161, 249 A.2d 382 (1969). Under the plain error rule, plaintiff is entitled to a new trial as to defendant Schell.

E.
Even though the jury did not reach the issue of damages, we feel constrained to comment briefly with respect thereto. In the event of a retrial, the jury should be asked to arrive at two percentages, one on the issue of liability and the other as a just apportionment of damages by "expressing mitigation of damages as a percentage of fault which reduces plaintiff's damages." Id., 111 N.J. at 443, 545 A.2d 148. See also Scafidi v. Seiler, 119 N.J. 93, 110-113, 574 A.2d 398 (1990). Cipollone v. Liggett Group, Inc., 893 F.2d 541, 557-558 (3d Cir.1990), rev'd in part on other grounds, ___ U.S. ___, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), is instructive as to how the two percentages worked in Ostrowski:
On remand, the jury was instructed to arrive at two percentage figures regarding plaintiff's conduct: first, the degree to which her conduct after treatment had begun was responsible for the toe surgery, and second, the degree to which her conduct after treatment had begun  considering her conduct both before and after *363 the toe surgery  was responsible for her ultimate injury, the bypass surgery. If the first percentage (the plaintiff's fault for the toe surgery) was less than the physician's fault for the toe surgery, the plaintiff would recover. Her recovery, however, would be offset by the second percentage times the damages suffered (which reflects plaintiff's total responsibility for her ultimate injury).[9] If the first percentage was greater than the physician's fault for the surgery, plaintiff's recovery would be barred by the Comparative Fault Act.
[Id. at 557-58]
Footnote 9 in Cipollone reads:
An example may help to clarify. Suppose the jury finds that the plaintiff suffered $100,000 in damages from the bypass surgery. Suppose also the jury finds that, after plaintiff had begun treatment with the podiatrist, her conduct before the toe surgery was 10% responsible for her ultimate injury (the first percentage), but that her conduct before and after the toe surgery combined were 80% responsible (the second percentage). Thus the podiatrist's conduct (before the toe surgery) must have been 20% responsible for the ultimate injury. On these facts, even though the plaintiff's total conduct was more responsible for her injury then the podiatrist's (80% versus 20%), she would recover, because her conduct before the toe surgery was less responsible for her ultimate injury than the podiatrist's conduct during that time (10% versus 20%). However, her ultimate recovery would be only $20,000 (because the podiatrist was only 20% responsible for the ultimate injury).
[Id. at 558, n. 9]

III
We reject plaintiff's contention that the judge erred in dismissing the claim against Gerard as being time barred. Plaintiff retained an attorney on July 2, 1986, within two months of the amputation of his left leg below the knee on May 7, 1986. The attorney and/or an expert retained by plaintiff had the hospital record shortly thereafter. The attorney obtained an expert opinion as to malpractice in the case on June 18, 1987. Gerard's opinion was contained in those hospital records. Yet no claim was made against Gerard until October 11, 1990. The trial judge properly concluded that the lack of diligence precluded plaintiff from benefiting from the discovery rule. See Lopez v. Swyer, 62 N.J. 267, 300 A.2d 563 (1973).
The judgment denying any recovery against defendant Schell is reversed and remanded to the Law Division for a new trial. The *364 judgment dismissing the claim against defendant Gerard is affirmed.