John RAGNIS, Individually and on behalf of The Estate of Tina Maria Ragnis, Richard W. White, John Ragnis, II, Charles B. Ragnis, and Joshua Ragnis, Plaintiffs

v.

Andrew P. MYERS, M.D., and Glasgow Medical Associates, P.A., Defendants.

Civil Action No. 09C–05–057–JOH.

Superior Court of Delaware, New Castle County.

Submitted: June 14, 2012.
Decided: July 13, 2012.
Corrected Cover Page: July 16, 2012.

Michael C. Rosendorf, Esquire, of Shelsby & Leoni, Wilmington, Delaware, and Robert C. Morgan, Esquire, of Morgan, Carlo, Downs & Everton, P.A., Hunt Valley, Maryland, Attorneys for the Plaintiffs.

Joshua H. Meyeroff, Esquire, and Andrew E. Vernick, Esquire, of Wharton Levin Ehrmantraut & Klein PA., Wilmington, Delaware, Attorneys for the Defendants.

## OPINION

HERLIHY, Judge.

Tina Maria Ragnis died of a pontine intracranial hemorrhage on September 20,

2007. Her estate and family claim that defendant Dr. Andrew Myers[1] failed to properly diagnose and treat Ms. Ragnis for hypertension which they also contend was the cause of her fatal pontine stroke.

Dr. Myers has recently raised, in a motion for partial summary judgment, the issue of her potential comparative negligence.[2] He argues that it arises from her long-standing heavy smoking, failure to heed physicians' advice to stop and/or medicate to help with stopping, and that this particular kind of stroke was caused by damage to her arteries from that smoking and not hypertension.

In two limited cases involving claims of medical negligence, where plaintiffs ignored specific instructions relating to their treatment which then led to injury, comparative negligence, as an affirmative defense, was allowed. As far as known, there was not an issue in those cases whether such a defense could be raised. Therefore, the issue here is one of first impression. This case differs from those two cases. Ragnis was not being treated for the effects of her long standing heavy smoking (although certain conditions like her asthma and/or COPD may or may not be related). For at least five years prior to her death, she was continuously advised by several doctors to cease smoking but she did not. Ultimately there was an overlap of time in which it is claimed there was a failure to diagnose and treat her hypertension and also being told again to stop smoking. With that factor and the defense evidence that her smoking caused the unique stroke in this case, the issue is whether comparative negligence may be raised as an affirmative defense? The Court holds that under the facts of this case the issue of Ragnis' comparative negligence may be presented to the jury.

### Factual Background

Ragnis was fifty-one years old when she died. The records supplied to the Court are not in dispute. They reveal information about her smoking history and the repeated medical advice she was receiving about it:

· In a discharge summary from Christiana Care Hospital of November 19, 2002, the following was noted:

"This patient is a 46–year–old 2–pack–per day smoker for approximately 30 years . . ."

"She was offered but declined a nicotine patch . . . . She was given information regarding smoking cessation. Her husband does not smoke and is very interested in assisting with this endeavor.

"DISCHARGE DIAGNOSIS:"

. . .

4. Tobacco addiction.[3]

· In an OBGYN record, of August 11, 2003, it states:

"She is a heavy smoker and cannot take hormones."[4]

· A Christiana Care Health Services record of October 14, 2003 reports:

---

1. There are several medical practices named as co-defendants. The true defendant is Dr. Myers. The Court confines its opinion to him and his alleged conduct and records.

2. The defendants raised the issue at the pretrial conference on June 14, 2012. It was one which should have been raised far earlier rather than on the eve of trial.

3. Defendants' Exhibit A to their Motion for Partial Summary Judgment (hereinafter "DX——").

4. DX B.

"The patient is a 2–pack–a–day smoker, and is not a candidate for oral contraceptive." [5]

· In a September, 2007 Christiana Care Admission document, the following is noted:

"Past Medical History[:] Emphysema, High Blood Pressure, Other: Scoliosis"

"Ever Smoked Tobacco[:] Current Smoker"

"Smoking Cessation Material Given[:] Refused/Unable to Receive" [6]

· On a Christiana Care document dated September 19, 2007, the day she was admitted for the stroke in this case, it is noted:

"Social History: Married, 20–40 pack years—still smoking." [7]

· A Christiana Care "Consultation" note reflects under Social History:

"She was a half a pack a day smoker." [8]

Dr. Myers has testified that over a period of several years he told her she needed to quit smoking. His office records contain various references to Ragnis' smoking:

· An undated record noting "Tobacco abuse." [9]

· A 12/3/02 record indicating Ragnis smoked 2 packs per day for 30 years. [10]

· A 2/12/04 record states "COPD continued drug abuse—rediscussed quitting. [11]

· A record from 8/23/04 reflecting that he told her to reduce her alcohol intake and her tobacco intake. [12]

· A 4/11/05 note under COPD Dr. Myers' note states he told her she needed to quit tobacco and that she will think about it. [13]

· An 8/8/05 record states "COPD continues to smoke—needs to quit. [14]

Similar notes go on at various times in 2006 though May, 2007. Dr. Myers' May 7, 2007 office record shows a blood pressure reading of 142/88. It is on this date that plaintiffs contend the standard of care, based on that reading and her "history of hypertension" required Dr. Myers to immediately (1) prescribe an anti-hypertensive medication and (2) undertake immediate and frequent follow-up. [15] In medical records from October 9, 2006 her blood pressure was noted as 136/82; in a record of December 1, 2005 it was noted as 136/86; in an April 1, 2005 record as 132/82; and in a November 13, 2003 record her blood pressure was noted as 132/80.

While plaintiffs cite to May 7, 2007 as a date Dr. Myers allegedly failed to properly diagnose and treat Ragnis' hypertension, they also refer to her prior history of hypertension. Plaintiffs have not provided any expert reports to explain what her "history of hypertension" was, such as the pre-May, 2007 blood pressure readings cited above. Her blood pressure reading on May 7th was, as noted above, 142/88.

---

5.  DX C.

6.  DX D.

7.  DX E.

8.  DX F.

9.  DX H, unnumbered page.

10.  DX H.

11.  *Id.*

12.  *Id.*

13.  *Id.*

14.  *Id.*

15.  Plaintiff's complaint, ¶ 13.

What is key to the resolution of the discrete issue presented is another entry in those same May 7, 2007 medical records:

IMPRESSION/PLAN:

2. Tobacco Rediscussed w/ patient continue Albuterol should quit.[16]

The second office visit record of Dr. Myers is September 10, 2007. Ragnis' blood pressure is noted as 150/100 and 154/102. An increase in blood pressure is noted and it is further stated "t/c (to consider) starting med." There is no reference to smoking or cessation of smoking. The last blood pressure record from an office visit is September 17th in which it is noted that her blood pressure was 154/96 and 150/92. She had her pontine stroke on the 19th and died on the 20th.

Ragnis' husband was aware of his wife's smoking and several unsuccessful efforts to stop. He knew she rejected medication to help her stop. He, however, did not know how much she smoked; she never smoked in the house. She rejected his requests to stop smoking.

Dr. Myers has retained two experts for trial. One, Dr. Romergryko Geocadin is a neurologist. It is his opinion that Ragnis had a pontine hemorrhage. The pons is a specific area of the brain. He said Ragnis' range of blood pressure did not play a real factor in her pontine hemorrhage, nor was her blood pressure a contributing factor in the bleed.[17] The integrity of a blood vessel can be affected by long exposure to cholesterol, smoking, infection and other things. He made a gross comparison to a pipe weakened by rust. The blood pressure noted in the ICU when she was brought in on September 19th, would not pop an oth-erwise normally functioning blood vessel. He also said:

Smoking is notorious to cause vasculopathy that weakens blood vessel wall. So the question there is, Is the stroke or the hemorrhage going to happen? I mean, there's some pressure there, but the lowering of the blood pressure or rather the lowering of—correct that. It's not blood pressure. The lowering of the ability of the blood vessel wall to contain even normal pressures could potentially have led to this, so answer is, I cannot give you one specific answer.

If you're asking me, Is it primarily the high blood pressure? I would categorically say, No, I don't think it is just the blood pressure. Is it in association with many things? The smoking certainly contributed. A very big deal given, you know, she already have COPD, right, so she has end-organ damage already from smoking itself, and I think that that is the critical combination there.[18]

The other defense expert is Dr. Michael Miller who is an internist and cardiologist. He testified it was probable Ragnis' pontine hemorrhage was due to her long-standing smoking. A pontine stroke is not, he said, the kind of stroke which comes from hypertension. Hypertensive strokes, he said, are in the lacunar region not the pontine. Finally, he said the blood pressure reading Ragnis had was not of a magnitude to cause a pontine stroke.

### Applicable Standard

Summary judgment, or partial summary judgment, may only be granted where there are no genuine issues of material fact and the moving party is entitled to

---

16. DX H.

17. Dr. Geocadin's verbose and rambling answers to a number of questions make it un-clear if he does or does not rule out high blood pressure as a contributing factor.

18. Dr. Geocadin deposition, pp. 44–5.

judgment as a matter of law.[19] The plaintiffs have not raised any factual issues or indicated that there are any factual issues. The issue the parties agree, therefore, is purely legal and that is whether Dr. Myers may introduce the evidence of Ragnis' smoking to demonstrate comparative negligence and causation.

### Discussion

This Court has permitted comparative negligence in a medical malpractice case before. In *Esry v. St. Francis Hospital*[20] comparative negligence was the plaintiff's ignoring a nurse's advice not to get out of his bed alone to go to the bathroom. At some prior point, the plaintiff had suffered some dizziness which prompted the nurse to so instruct him. He attempted to go to the bathroom alone, fell and injured himself.

In the context of a healthcare provider setting, this Court in another case did not permit as a primary assumption of risk, a claim the injured plaintiff's fall, while a patient in an independent living facility, was due to a risk he was aware of and to which he assented.[21] There is no indication that comparative negligence was raised. There is no discussion of it in the Court's opinion.

The District Court of Delaware used comparative negligence in a medical negligence case to find a plaintiff's negligence was more than fifty percent of the total negligence thereby barring recovery.[22] The court applied Delaware law, though it was a VA doctor sued, and invoked comparative negligence. Basically after years of problems in his groin and testicular areas, the plaintiff ignored his doctor's advice to return if his testicles/groin pain worsened. One testicle became two and a half times larger than the other, but, though clearly worsening, the plaintiff waited months to return to his doctor. By that time his condition was substantially worse and a later stage cancer was diagnosed. The plaintiff's delay in returning is what the Court found prevented proper timely treatment and he was comparatively negligent.

The application of comparative negligence in this case and in many medical negligence cases is not always clear cut. This case does not involve a patient misleading a doctor about what he or she is doing or not doing nor failure to take necessary medication. Smoking may be viewed more as a "lifestyle" matter and, in some cases, can be viewed as a choice having no bearing on a claimed discrete act of failure to treat leading to injury or death. Further, as many courts have recognized in medical negligence cases, there is a great reluctance to relieve a physician of liability for a breach of the standard of care causing injury or death.[23] That is not to say that in an appropriate case, the plaintiff's negligence cannot be presented in a medical negligence case.[24]

The issue then is whether Ragnis' continued heavy smoking over a period of years contrary to repeated medical advice, and which may have caused the stroke that

19. *Wilmington Trust Co. v, Aetna*, 690 A.2d 914, 916 (Del.1996).

20. 2002 WL 558878 (Del.Super. Apr. 15, 2002), aff'd 812 A.2d 900, 2002 WL 31818083 (Del. Dec. 4, 2002) (TABLE).

21. *Storm v. NSL Rockland Place, LLC*, 898 A.2d 874 (Del.Super.2005).

22. *Anderson v. United States*, 1996 WL 490262 (D.Del. Aug. 23, 1996).

23. *See e.g. Cowan v. Doering*, 111 N.J. 451, 545 A.2d 159 (N.J.1988).

24. *See Jensen v. Archbishop Bergan Mercy Hosp.*, 236 Neb. 1, 459 N.W.2d 178, 184 (1990).

led to her death and continuing to smoke during the time plaintiffs claim she was not properly diagnosed and treated for hypertension can be presented as comparative negligence? Courts have struggled with the issue of comparative negligence and have enunciated when it may be raised and when it cannot; outside the circumstances in the cases noted earlier.[25]

The New Jersey Superior Court Appellate Division in *Bryant v. Calantone* referred to three tests for the applicability of contributory/comparative negligence: (1) the pre-treatment period, (2) the treatment period during which the alleged medical negligence occurred, and (3) the post-medical negligence period.[26] The plaintiff in *Bryant*, being treated for a heart murmur, was told if he ever had any dental work to make sure he took an antibiotic before and after the procedure. The dentist (defendant) gave plaintiff an antibiotic before the procedure telling Bryant that was all he needed. He gave him no post-procedure medicine or a prescription. Comparative negligence was not permitted to be raised because the plaintiff told the dentist he needed before and after medication, but the dentist said otherwise, thereby giving medical advice which relieved the plaintiff of any negligence or duty he had. The dentist committed medical negligence by failing to give post-procedure medication. A bacterial infection of the outer heart muscle developed soon thereafter attributable to bacteria from the dental procedure.

The line the New Jersey court drew is clear. Plaintiff did all he could do when advising the dentist of what his cardiologist said, but it was the dentist's separate act in contradiction which was the breach and cause of injury.[27]

The Iowa Supreme Court in *DeMoss v. Hamilton*[28] faced a comparative negligence issue with overtones similar to this case. The deceased plaintiff, thirty-two, who had family history of early onset coronary disease, suffered a fatal heart attack the day after he had been seen by the defendant doctor at a hospital. The doctor found no cardiac problem and released the decedent with a prescription for antibiotics for what was believed to be a lung problem causing chest pains. Two years before, after suffering a heart attack, doctors told the decedent to stop smoking, exercise, and lose weight. It was his failure to do these things which the Supreme Court found was not appropriate for comparative negligence.[29]

The Iowa Court referred favorably to *Jensen v. Archbishop Bergan Mercy Hospital* in which that Court said:

Consequently, to be considered as and constitute contributory negligence in a medical malpractice action, a patient's negligence must have been an active and efficient contributing cause of the injury, must have cooperated with the negligence of the malpractitioner, must have entered into proximate causation of the injury, and must have been an element in the transaction on which the malpractice is based. Accordingly, in a medical malpractice action, the defense of contributory negligence is inapplicable when a patient's conduct provides the

---

25. *Supra* pp. 1229–30.

26. *Bryant v. Calantone*, 286 N.J.Super. 362, 669 A.2d 286, 288 (App.Div.1996) (citing *D'Aries v. Schell*, 274 N.J.Super. 349, 644 A.2d 134, 139 (App.Div.1994)).

27. *Bryant*, 669 A.2d at 289.

28. 644 N.W.2d 302 (Iowa 2002).

29. Its finding is dicta since the jury found the doctor had not been medically negligent. *DeMors*, 644 N.W.2d 302, 307 (Iowa 2002).

occasion for medical attention, care, or treatment which later is the subject of a medical malpractice claim or when the patient's conduct contributes to an illness or condition for which the patient seeks the medical attention, care, or treatment on which a subsequent medical malpractice claim is based.[30]

Curiously, in *Jensen* the plaintiff was very overweight and had been advised to lose weight over a period of time. He suffered a broken back in a sledding accident, was treated for potential blood clots over a period of several weeks but eventually died from cardiac arrest due to a pulmonary embolism. The Jensen Court found the decedent's failure to lose weight not to be a basis for contributory negligence.[31]

■ In reviewing the various opinions attempting to define when a defense of comparative negligence may or may not be used, one factor seems to be present. If there is a discrete, specific and identifiable moment or act of claimed medical negligence, such as going to an emergency room for a condition or treatment, the defense is inapplicable even if the patient has ignored prior physician advice. This case is not that situation.

■ Using the two *Bryant* tests applicable to this case, (1) pre-treatment period and (2) treatment period during which medical negligence occurred,[32] those tests indicate comparative negligence is an appropriate defense in this case. During the pre-treatment period,[33] Dr. Myers from 2002 through at least May 7, 2007, was advising Myers to quit smoking. She refused medication to help her stop.

On the date the plaintiffs complain Dr. Myers failed to diagnose and commence treatment for her hypertension she and the doctor "re-discussed" ceasing smoking. He told her she should quit. So, using the *Bryant* tests, her conduct before and during the treatment period indicate comparative negligence is an applicable defense.

Using the language from *Jensen* that her negligence (1) "must have been an active and efficient contributing cause of injury," (2) must have "cooperated" with the doctor's medical negligence, (3) must have entered into proximate cause of her injury, and (4) "must have been an element in the transaction" on which the medical negligence is based,[34] Ragnis' years long heavy smoking and continuous disregard of medical advice to cease smoking makes comparative negligence an applicable defense.

The Court notes, however, that it has not yet addressed one key factor needed to reach that finding. According to Dr. Myers' experts, Ragnis' pontine stroke was caused by her smoking, in that years of doing so significantly weakened the walls of the vessels carrying blood to the brain and possibly, even "normal" blood pres-

30. 236 Neb. 1, 459 N.W.2d 178, 186–87 (1990).

31. *Id.*

32. *Bryant*, 669 A.2d at 288.

33. As the Court noted earlier the plaintiffs identified May 7, 2007 as the first specific date on which Dr. Myers is alleged to have failed to diagnose and properly treat Ragnis' hypertension, but yet they refer to her history of hypertension. Therefore, it is somewhat unclear on the current record before the Court whether an earlier period of time may arise at trial and if so what. The medical records and admonitions to stop smoking began in 2002 and the latter were continuous into 2007. The Court notes the significance of the May 7, 2007 date as this action was filed May 6, 2009 just as the statute of limitations was about to expire.

34. *Jensen*, 459 N.W.2d at 186.

sure would have caused the fatal hemorrhaging. While the plaintiffs' experts disagree, which a jury will have to sort out, the key final link in the claim for this defense is that testimony. A pontine stroke they said, is not one in the area of the brain where one expects to see a stroke due to hypertension.

It is fair to ask why not limit the issue of her smoking to proximate cause only? In another kind of case that may be the answer, but here employing the tests in *Bryant* and *Jensen,* the Court finds the more inclusive approach, comparative negligence as an affirmative defense, to be the applicable answer. Though not a medical negligence case, another but separate reason why this Court finds comparative negligence applicable is found in *Asbestos Litigation v. Owens–Corning.*[35] There, the Supreme Court found this Court erred when it submitted the issue of the decedent's smoking only as it related to proximate cause but without the predicate finding of comparative negligence.

Like the expert testimony in this case, one defense expert testified in the asbestos case that the decedent's smoking was the sole cause of the decedent's lung cancer; though it appears there may have been other testimony that it was one of the proximate causes. Among the errors the Supreme Court found in this Court's instructions was that the jury was to apportion *damages* based on the percentage caused by asbestos exposure and the percentages due to smoking. Specifically, this Court's error was to have the jury apportion damages based on a percentage due to asbestos exposure and a percentage based on smoking without the jury first being asked to find the decedent contributorily negligent.[36]

The proximate cause of Ragnis' death is a hotly contested issue. To limit the issue of her smoking to the proximate cause, or one of the proximate causes, of her death violates the holding in *Asbestos Litigation.* It would separate a finding of proximate cause from the evidence supporting the basis of that cause without the necessary predicate finding of negligence, and would isolate the issue of the cause of death to the exclusion of the undisputed history in this case.

Accordingly, Ragnis' history of smoking and ignoring repeated medical advice, even repeated on the date plaintiffs claim the medical negligence began, may be used as an affirmative defense. This Court joins other courts addressing this issue, that each case must be examined on its own facts. The ruling in this case is not applicable in all medical negligence cases where the injured or deceased may have been negligent in some respect.

### Conclusion

For the reasons stated herein, the defendants' motion for partial summary judgment on the issue of comparative negligence is **GRANTED.**

**IT IS SO ORDERED.**

---

**35.** 669 A.2d 108, 112 (Del.1995).

**36.** *Id.*