719 A.2d 716

PIA MANCUSO AND LENNY MANCUSO, HER HUSBAND, PLAIN-TIFFS–APPELLANTS, v. SPERO NECKLES, M.D., BY PETER J. NECKLES, AS ADMINISTRATOR OF THE ESTATE OF SPERO NECKLES; KARL G. KLINGES, M.D., DAVID G. BUTLER, M.D., JAMES C. VAN ELSWYK, M.D., SPERO NECKLES, M.D., PRO-FESSIONAL ASSOCIATION ALSO KNOWN AS DRS. KLINGES, BUTLER, VAN ELSWYK, NECKLES, P.A.; HERBERT A. GOLD-FARB, M.D.; HERBERT A. GOLDFARB, M.D., P.A.; MONT-CLAIR IMAGING CENTER; AND STEVEN SIRECI, M.D., DE-FENDANTS, AND CLIFFORD BEINART, M.D., DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued October 14, 1998—Decided November 10, 1998.

Before Judges MUIR, Jr., EICHEN, and COBURN.

*Alfred D. Dimiero* argued the cause for appellants (*Mella and Dimiero*, attorneys; *Mr. Dimiero*, on the brief).

*William S. Mezzomo* argued the cause for respondent (*McDonough, Korn, Eichhorn & Boyle*, attorneys; *James R. Korn*, of counsel; *Mr. Mezzomo*, on the brief).

The opinion of the court was delivered by

COBURN, J.A.D.

In this medical malpractice case, the Law Division judge granted summary judgment to the remaining defendant, Clifford Beinart, M.D. On appeal, plaintiffs, Pia Mancuso and her husband, Lenny Mancuso, who sues per quod, contend that the judge erred in dismissing their case on the ground that the statute of limitations had run by misapplying the discovery rule of *Lopez v. Swyer*, 62 *N.J.* 267, 300 *A.*2d 563 (1973). We disagree, and therefore, we affirm the judgment.

The relevant facts are not in dispute.[1] On two occasions, the first in 1988 and the second in 1989, Pia Mancuso, hereinafter referred to as plaintiff, had mammography (radiological studies of

---

[1] Plaintiffs maintained at oral argument that no purpose could possibly be served by a plenary *Lopez* hearing. Defendant agreed. "Where credibility is not involved, affidavits, with or without depositions, may suffice; it is for the trial judge to decide." *Id.* at 275, 300 *A.*2d 563. Credibility is not at issue. The trial court resolved this case by reference to the objective test of what a reasonable person should have known. We have followed the same course, accepting as true, for purposes of this opinion that plaintiff did not believe Dr. Beinart was at fault.

the breasts) performed at the Montclair Imaging Center. Dr. Beinart, a radiologist, interpreted the films and prepared and signed mammogram reports for plaintiff's physician. In each instance, Dr. Beinart noted the existence of a cyst as a possible abnormality of the right breast and described the cyst as "most likely benign." In the first report, he recommended a follow-up mammogram in six months, and in the second report he recommended another mammography in a year. He had no further involvement with plaintiff.

In June 1991, plaintiff entered Holy Name Hospital for a hysterectomy, which included a mammogram as part of the pre-operative work-up. Plaintiff arranged for her 1988 and 1989 mammogram films to be sent to the hospital as a baseline. A radiologist found ovoid densities in the right breast and recommended to plaintiff's surgeon, Spero Neckles, that she undergo a follow-up mammogram in four months. Plaintiff contends that Dr. Neckles failed to advise her of either the abnormal findings or the recommendation for a follow-up in four months. These allegedly abnormal findings and the failure to provide plaintiff with appropriate advice in relation to them formed the initial basis for this civil action.

On July 8, 1992, plaintiff underwent another mammography. The report indicated the cyst identified in the 1988 and 1989 films had not changed, but it also revealed the existence of a suspected malignancy in the right breast in the area of the ovoid densities. Shortly thereafter, the cancer in the right breast, and its extension into eighteen lymph nodes, was confirmed.

Because of the extent of her tumor and metastases to her lymph nodes, plaintiff was confronted with an extremely poor prognosis. Consequently, she underwent an autologous bone marrow transplant and months of debilitating radiation therapy. In December 1992, shortly before the transplant, plaintiff learned for the first time of the abnormality reflected by the June 1991 mammogram and the radiologist's recommendation for a four month follow-up mammogram.

In June 1993, plaintiff consulted counsel with her immediate concern being the failure of Dr. Neckles in June 1991 to advise her of the recommendation for a follow-up mammogram in four months. Plaintiff certifies that at no time did she suspect that her 1988 or 1989 mammogram had been misread. The retainer agreement indicated that she felt the responsible party was defendant Spero Neckles, the surgeon who performed the hysterectomy in June 1991. However, the retainer also said that she was retaining the law firm to "make a claim on [her] behalf against others who are responsible for [her] injuries or damages."

Acting pursuant to the retainer, plaintiff's counsel submitted all of plaintiff's mammograms to a radiologist. On June 24, 1994, the radiologist, Stephen V. LoCurcio, M.D., reported that in his opinion there had been malpractice in 1991, not with respect to the reading of the mammogram by that radiologist, but because of the failure of the surgeon to recommend follow-up studies in a timely fashion. However, with respect to Dr. Beinart's interpretations of the 1988 and 1989 mammographies, LoCurcio said, "I agree with ... the ... interpretations and reports.... I would have reached the same conclusion and [rendered] similar reports as [the] Radiologist!"

Plaintiff filed suit on July 6, 1994, against Neckles, his partners, and their medical group on the basis suggested by Dr. LoCurcio. On February 4, 1997, as a result of reviewing defense expert reports that pointed a finger at additional physicians, including the April 25, 1996 report of Dr. Richard Creech, plaintiff filed an amended complaint adding as defendants Drs. Sireci and Goldfarb, and the Montclair Imaging Center.

Creech's report included this statement: "In retrospect, this area represented an early breast cancer that can be· seen on the November 3, 1989 films." As a result of Creech's comment, plaintiff's counsel asked Dr. Howard Miller to review the 1988 and 1989 films. Dr. Miller submitted a report on November 22, 1996, indicating that a possible malignancy was evident on those films and that the interpreting physician had "deviated from accepted

standards of radiological care." Neither Creech nor Miller referred to Dr. Beinart by name, and plaintiff's counsel certified that he did not learn of Beinart by name until April 25, 1997, when an attorney for one of the other defendants provided the information in response to a letter mailed ten days earlier. However, as noted above, Dr. Beinart signed his reports in 1988 and 1989, and plaintiffs had copies of them. Even assuming that his signature was difficult to read, there is no evidence that he could not have been identified as easily in 1993 as he was in 1997. On July 7, 1997, plaintiff obtained court approval for the filing of a second amended complaint adding Dr. Beinart to the case as a defendant. The second amended complaint was filed on July 14, 1997, and an answer, raising the statute of limitations defense, was filed on September 11, 1997.

The statute of limitations governing actions for personal injuries requires a plaintiff to commence the action within two years after the cause of action shall have accrued. *N.J.S.A.* 2A:14–2. Medical malpractice actions generally accrue on the date the alleged act or omission occurred. *Bauer v. Bowen*, 63 *N.J.Super.* 225, 230–31, 164 *A.*2d 357 (App.Div.1960). However, the discovery rule is always potentially available to ameliorate the harsh results that would flow from a rigid adherence to the general rule. *See Lopez v. Swyer, supra*, 62 *N.J.* at 273–74, 300 *A.*2d 563. The discovery rule delays the accrual of the cause of action until "the injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim." *Id.* at 272, 300 *A.*2d 563.

In *Baird v. American Medical Optics*, 155 *N.J.* 54, 713 *A.*2d 1019 (1998), the Court said:

Critical to the running of the statute is the injured party's awareness of the injury and the fault of another. The discovery rule prevents the statute of limitations from running when injured parties reasonably are unaware that they have been injured, or, although aware of an injury, do not know that the injury is attributable to the fault of another.

[*Id.* at 66, 713 *A.*2d 1019 (citations omitted).]

The test is not solely subjective, although it takes into account the plaintiff's knowledge. The question is whether the plaintiff "knew *or should have known* of sufficient facts to start the statute of limitations running. . . ." *Id.* at 72, 713 *A.*2d 1019 (emphasis added).

■ Defendant contends the statute of limitations began to run when plaintiff learned that she had an advanced case of breast cancer in 1992. Plaintiff admits that at that point in time, more specifically by December 1992, she knew that a review of her 1991 mammogram had possibly revealed sufficient data, indicative of cancer, to have warranted a follow-up mammogram in four months. Although she then believed that the 1988 and 1989 mammograms did not indicate a possibility of cancer, she brought them to her attorney, who, in turn, submitted them along with other materials to a radiologist for review for the purpose of determining whether malpractice had been committed by any of the physicians.

Dr. Beinart was not included as a defendant in the original complaint because plaintiff's expert found him to be without fault. Nonetheless, by July 1992 plaintiff knew of her injury, and by December 1992, at the latest, she knew that an earlier mammogram could be medically and legally significant in that it might indicate a possibly cancerous growth. In 1993, when she retained counsel, she fully understood that the failure to notify her of the results of the 1991 mammogram might well have resulted in a delayed diagnosis as a result of which she was faced with a more serious condition. Since Dr. Neckles had failed to recognize the significance of the 1991 mammogram and the radiologist's report thereon, which may have suggested abnormality, plaintiff certainly knew that a physician might err in reacting to such information. In fact, that is why she retained counsel. Although plaintiff could have sought medical opinions from other experts, she chose to rely on her expert's opinion.

A reasonable person in plaintiff's position should have been aware that her expert's opinion was not necessarily the last word

on the subject of who might have done her wrong. In 1992, plaintiff knew of her injury, the increase in the cancer caused by a delayed diagnosis, and she knew that it had been possibly caused by the negligence of another. A reasonable person would have appreciated that the universe of possible others included any of the radiologists who had read the mammograms. Dr. Beinart was clearly within that universe. Although plaintiff did not know him by name, she had his reports and mammograms, and she could have as easily identified him by name in 1992 or 1993 as she did in 1997.

In *D'Aries v. Schell,* 274 *N.J.Super.* 349, 644 *A.*2d 134 (App.Div. 1994), one of the physicians was alleged to have committed malpractice based on his opinion that the plaintiff was not a candidate for vascular bypass surgery. *Id.* at 356, 644 *A.*2d 134. The opinion was contained within the plaintiff's hospital record, which plaintiff submitted to his medical expert. *Id.* at 363, 644 *A.*2d 134. The expert did not identify this physician's opinion as malpractice, and the physician was not brought into the suit until the normal statute of limitations had run. *Ibid.* The claim against this physician was dismissed by the trial court as barred by the statute of limitations. We affirmed the dismissal with this observation:

> We reject plaintiff's contention that the judge erred in dismissing the claim against Gerard as being time barred. Plaintiff retained an attorney on July 2, 1986, within two months of the amputation of his left leg below the knee on May 7, 1986. The attorney and/or an expert retained by plaintiff had the hospital record shortly thereafter. The attorney obtained an expert opinion as to malpractice in the case on June 18, 1987. Gerard's opinion was contained in those hospital records. Yet no claim was made against Gerard until October 11, 1990. The trial judge properly concluded that the lack of diligence precluded plaintiff from benefiting from the discovery rule. *See Lopez v. Swyer,* 62 *N.J.* 267, 300 *A.*2d 563 (1973).

> [*Ibid.*]

Under *D'Aries,* where, as here, all the factual information necessary for identification of a possible physician-defendant is available to a plaintiff, she cannot rely on her expert's failure to identify the malpractice as a basis for application of the discovery rule. It follows that she cannot rely on the subsequent report of a

defense expert who based his opinion on precisely the same information reviewed by her expert.

Plaintiff contends the following New Jersey cases support reinstatement of her complaint against Dr. Beinart: *Lynch v. Rubacky*, 85 *N.J.* 65, 424 *A.*2d 1169 (1981); *Vispisiano v. Ashland Chemical Co.*, 107 *N.J.* 416, 527 *A.*2d 66 (1987); *Graves v. Church & Dwight Co.*, 115 *N.J.* 256, 558 *A.*2d 463 (1989); and *Savage v. Old Bridge–Sayreville Medical Group*, 134 *N.J.* 241, 633 *A.*2d 514 (1993).

*Lynch, supra,* provides no support for plaintiff's position. In that case, the doctor improperly set plaintiff's broken ankle. 85 *N.J.* at 67–68, 424 *A.*2d 1169. The malpractice was concealed by what a reasonable person could confuse as a painful, but normal, healing process. *Ibid.* In other words, that case involved a circumstance where fault was not implicit in the injury.

Here, fault is implicit because the injury—increased growth of the cancer resulting from an alleged misreading of a mammogram—is clear evidence of malpractice. Accordingly, the plaintiff knew or should have known that her cancer might have been revealed in any of the prior mammograms, including those read by Dr. Beinart. Although plaintiff did not suspect those mammograms, a reasonable person would have.

Moreover, in *Lynch*, the plaintiff's discovery of the possible negligence of the defendant from a second treating physician suggests that malpractice was not implicit. The Court said:

To the contrary, plaintiff's decision to seek the advice of another physician cannot be regarded as conclusive evidence that, by that time, she not only disbelieved Dr. Rubacky but she also fully suspected that he was guilty of medical malpractice. The decision to seek a second medical opinion in the face of unresolved medical problems is not uncommon and is a commendable course of action generally to be encouraged. See Department of Health, Education & Welfare, "The Impact of Second Opinions," *Forum*, Vol. 2, No. 5, pp. 2–9 (1978); L. Williams, M.D., *How to Avoid Unnecessary Surgery*, (1971), pp. v-xii, 31–45. There is no suggestion that in seeking out Dr. Argiroff plaintiff then had any reason to believe that Dr. Rubacky had rendered improper medical treatment.

Moreover, as noted by the trial court, Dr. Argiroff did nothing in the initial course of his treatment of Mrs. Lynch to discredit or cast Dr. Rubacky in a

professionally unfavorable light. When plaintiff first conferred with Dr. Argiroff in February and was advised of the need for additional surgery, he did not at that time plant in plaintiff's mind any seed of suspicion against Dr. Rubacky. She was confronted simply with a different medical opinion. There is no sufficient factual indication in the record that plaintiff, in the exercise of reasonable diligence and intelligence, should thereafter have done anything more than follow the medical advice of Dr. Argiroff. Nor is there any factual basis in the record showing that had she made more pointed inquiries concerning her past medical treatment she would have been rewarded with any information tending to impugn Dr. Rubacky. Indeed, when Dr. Argiroff later, in May 1974, first voiced the opinion that Dr. Rubacky had been at fault, he also stressed that he did not want "to point a finger at anyone" or become involved in any malpractice charge. *Cf. Yerzy v. Levine*, 57 *N.J.* at 235, 271 *A.*2d 425 (failure of physician performing a subsequent operation to have advised plaintiff that earlier surgery was improper is an equity in patient's favor and should be "take[n] into account" in discovery rule determination.)

[85 *N.J.* at 76, 424 *A.*2d 1169.]

In the instant case, by contrast, plaintiff did not seek a second opinion for purposes of treatment. Rather, she submitted all her mammograms to a forensic expert for the purpose of discovering which physicians had failed to properly diagnose her condition.

*Vispisiano, supra,* like *Lynch,* does not help plaintiff because it involved an injury that did not implicate the fault of another. Furthermore, the case turned to a substantial degree on the "unusual nature of the toxic tort case." 107 *N.J.* at 434, 527 *A.*2d 66.

*Graves, supra,* is a products liability case involving a plaintiff whose stomach was badly injured by the ingestion of baking soda, a seemingly benign product at the time of diagnosis. Neither he nor his treating physicians perceived any relationship between the baking soda and the injury. As the Court said, "For all plaintiff knew here, even if he connected his injury to the baking soda, it could easily have been thought an atypical reaction to a benign product." 115 *N.J.* at 267, 558 *A.*2d 463. The Court then said, "The determinative factor is that he had no awareness of any causative fault or defect in the baking soda, nor was it reasonable to charge him with such knowledge." *Ibid.* In short, the case turned on the fact that the product was thought to be benign, and its potential for harm did not come to the plaintiff's attention until he watched a television program years later.

In the instant case, *Graves* does not help plaintiff because we are not dealing with a benign product. We are dealing with a malignant disease that develops over time. Plaintiff was following a course of conduct, beginning no later than 1988, of subjecting herself to mammograms for the very purpose of obtaining a diagnosis as early as possible should the disease strike. Once the disease in extensive form was discovered, she reasonably should have known that the presence of the disease in incipient form might have been revealed in the 1988 or 1989 mammograms.

*Savage, supra,* also involved a circumstance where a reasonable person might have been unaware of the possible fault of another. The Court said:

> "Fault" in the context of the discovery rule is simply that it is possible—not provable or even probable—that a third person's conduct that caused the injury was itself unreasonable or lacking in due care. In other words, knowledge of fault does not mean knowledge of a basis for legal liability or a provable cause of action; knowledge of fault denotes only facts suggesting the *possibility* of wrongdoing. Thus, knowledge of fault for purposes of the discovery rule has a circumscribed meaning: it requires only the awareness of facts that would alert a reasonable person exercising ordinary diligence that a third party's conduct *may* have caused or contributed to the cause of the injury and that conduct itself might possibly have been unreasonable or lacking in due care.
>
> [134 *N.J.* at 248, 633 *A*.2d 514.]

We reiterate that under that test one cannot fairly conclude that plaintiff was reasonably unaware of the possible fault of Dr. Beinart, even though she may have believed that he did not err.

The *Savage* Court also noted this:

> The purpose of statutes of limitations is "to 'stimulate to activity and punish negligence' and 'promote repose by giving security to human affairs.'"
>
> [*Ibid.* (quoting *O'Keeffe v. Snyder,* 83 *N.J.* 478, 491, 416 *A*.2d 862 (1980)).]

Here the statute served its purpose in prompting plaintiff to action. She had two years from the discovery of her cancer and the possibly erroneous 1991 mammogram to prepare for the filing of a complaint. During that period, a reasonable person would have known that prior mammograms might contain evidence of the cancer at an early stage. There is no question that a reasonable person would have known that opinions do vary from

expert to expert, and that a particular expert might be wrong. We fail to see why Dr. Beinart's repose should be disturbed simply because plaintiff's expert agreed with him. Moreover, the failure to accord Dr. Beinart repose in such circumstances would be inconsistent with our decision in *D'Aries*.

Affirmed.