723 A.2d 1256 (1999)
Anna GALLAGHER and Thomas Gallagher, h/w, Plaintiffs-Respondents,
v.
BURDETTE-TOMLIN MEDICAL HOSPITAL; Alexander M. Pagnani, M.D.; Gene J. Braga, M.D.; Pagnani-Braga Urologic Associates, P.A.; Robert Steeb, M.D.; West Jersey Hospital Systems, Voorhees Division; South Jersey Radiology Associates; W. Weisberg, M.D.; Cape Emergency Physicians; Mark J. Todt, M.D.; and Robert J. Maro, M.D., Defendants, and
Howard R. Goldstein, M.D.; Neil Phillips, M.D.; and Urological Professional Association, Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Submitted January 12, 1999.
Decided March 1, 1999.
*1257 Stahl & DeLaurentis, Mount Laurel, for defendants-appellants (Dominic A. DeLaurentis and Sharon K. Galpern, Voorhees, on the brief).
Obermayer, Rebmann, Maxwell & Hippel, Haddonfield, for plaintiffs-respondents (Gregory D. Saputelli and Kimberly D. Sutton, on the brief).
Before Judges LONG, WEFING and CARCHMAN.
The opinion of the court was delivered by LONG, P.J.A.D.
By our leave, defendants Howard Goldstein, M.D., Neil Phillips, M.D. and the Urological Professional Association appeal from the denial of their motion to dismiss the medical malpractice complaint filed against them by plaintiff Anna Gallagher.[1] We affirm.
The facts necessary for disposition of this appeal are as follows. On May 19, 1994, Mrs. Gallagher, a fifty-year old insulin dependent diabetic, underwent a Marshall-Marchetti-Krantz[2] surgical procedure, performed by defendants Dr. Alexander Pagnani and Dr. Gene Braga at defendant Burdette-Tomlin Memorial Hospital.
Immediately after surgery, Mrs. Gallagher experienced serious complications including a significant loss of blood which collected in her abdomen. The day after her discharge from the hospital, blood began to leak from Mrs. Gallagher's stitches. She immediately went to see Dr. Pagnani who diagnosed her with a "hematoma" with a "draining sinus." Two days later, because Mrs. Gallagher was still bleeding and experiencing fever and chills, she went to the Emergency Room. The Emergency Room doctor, Dr. W. Weisberg, contacted Dr. Pagnani, who directed that Mrs. Gallagher be discharged. During the next three months, Mrs. Gallagher saw Dr. Pagnani multiple times in his office with no improvement.
In July of 1994, Mrs. Gallagher advised Drs. Pagnani and Braga that she was experiencing pain and having difficulty walking. Dr. Pagnani gave Mrs. Gallagher pain medication, diagnosed "acute lower back syndrome," and directed that Mrs. Gallagher see an orthopedic specialist. The specialist performed a CAT-scan of the lumbar spine and *1258 ruled out Mrs. Gallagher's back as the source of her pain.
In late August of 1994, when she had experienced no improvement, Mrs. Gallagher contacted her long-time family doctors defendants Robert J. Maro and his partner Mark J. Todt. Dr. Todt admitted her to West Jersey Hospital and ordered, among other things, a consultation with a urology team consisting of defendants Phillips and Goldstein. Drs. Todt, Phillips and Goldstein ordered several tests, including a CAT-scan of Mrs. Gallagher's abdomen and pelvis. The CAT-scan was performed on August 23, and read by defendant Dr. Robert Steeb on August 24, 1994. Dr. Steeb concluded in his report:
There is abnormal soft tissue density extending from the lower abdominal wall near the rectus muscle area and extending interiorly to an area just anterior to the urinary bladder. There may also be some thickening of the anterior wall of the urinary bladder. There is some associated destructive changes involving the superior pubic ramus on the right side. Since the patient had previous surgery, this most likely represents inflammatory process with associated osteomyelitis of the pubic bone. Clinical correlation is recommended.
Likewise, Drs. Goldstein and Phillips noted that the CAT-scan illustrated "erosion of the pubic symphysis" and diagnosed "osteitis pubis." Mrs. Gallagher was discharged from West Jersey, and placed on a steroid drug.
During the next few weeks, Mrs. Gallagher's pain increased and walking became more arduous. On September 7, 1994, Drs. Goldstein and Phillips re-admitted her to West Jersey, noting on her chart that she suffered from "perineal abscess, osteitis pubis, Status Post complicated Marshall-Marchetti-Krantz procedure." Another CAT-scan was performed and this time was interpreted by Dr. Samuel (an associate of Dr. Steeb) and defendant South Jersey Radiology Associates. Their report stated, in relevant part:
A large abscess collection is seen just anterior to the urinary bladder extending superiorly involving the recti muscles.... Since the last examination, there appears to be a worsening of the abscess, which appears larger in size with gas now within it. The abscess is now extended into the labium.
After this report, Drs. Goldstein and Phillips performed a supra-pubic exploration and drainage of the entire abscess area. Cultures of the drained material revealed three different types of bacteria; Drs. Goldstein and Phillips prescribed six weeks of antibiotic therapy. On Mrs. Gallagher's medical charts, Drs. Goldstein and Phillips listed "supra pubic abscess" and "osteitis pubis" as the ailments being treated during her re-admittance to West Jersey. Mrs. Gallagher's discharge diagnosis was identified by Drs. Goldstein and Phillips as "Pelvic, Perivesical and Labial Abscess."
Mrs. Gallagher now suffers from, among other things, total incontinence and has been receiving continuous treatment from Drs. Goldstein and Phillips. Since January of 1995, these physicians have performed five surgical procedures in which collagen is injected in Mrs. Gallagher's urethra in an attempt to restore continence.
On May 23, 1995, Mrs. Gallagher filed a lawsuit against Drs. Pagnani and Braga, Pagnani-Braga Urologic Associates, Burdette-Tomlin, and several fictitious defendants, identified as John Doe, Dr. John Doe, and John Doe Associates. On October 20, 1995, Mrs. Gallagher amended her complaint to add as defendants Dr. Steeb and West Jersey Hospital. On April 26, 1996, a second amended complaint was filed to name as additional defendants South Jersey Radiology Associates, Dr. W. Weisberg, and Cape Emergency Physicians.
During the course of the litigation, Mrs. Gallagher produced expert reports from Dr. Howard B. Simon, a board-certified urologist (dated September 5, 1995) and Dr. Seymour Piwoz, a board-certified radiologist (dated February 15, 1996). Dr. Simon concluded, among other things, that Drs. Pagnani and Braga were negligent in their care and treatment of Mrs. Gallagher by failing to take any action whatsoever with respect to a large blood clot that developed in Mrs. Gallagher's *1259 abdomen, which caused fluid to drain from her incision for over two months and developed into an abscess. Dr. Simon also found that Drs. Pagnani and Braga, as well as Dr. Weisberg, the emergency room physician, deviated from acceptable standards of care when they failed to culture the drainage from Mrs. Gallagher's incisions during their contacts with her, and failed to perform an ultrasound to evaluate the size or location of the blood clot. According to Dr. Simon, these deviations caused an infection to develop in Mrs. Gallagher's abdomen that went undiagnosed and grew into an abdominal abscess that continued to spread and to cause Mrs. Gallagher to sustain permanent injuries. Dr. Simon also opined that Dr. Steeb failed to diagnose the presence of an abscess on a CAT-scan dated August 23, 1994, and the resulting two-week delay before the correct diagnosis was made further contributed to Mrs. Gallagher's problems.
Likewise, Mrs. Gallagher's radiology expert Dr. Seymour Piwoz found that Dr. Steeb failed to diagnose the presence of an abscess on the August 23, 1994, CAT-scan, which was a deviation from the standard of care. Dr. Piwoz found that Dr. Steeb's report failed to comply with acceptable radiologic standards in a variety of ways, including but not limited to, the failure to list the most likely differential diagnoses that were attributable to the abnormalities described in the CAT-scan. These included an abdominal abscess. Dr. Piwoz concluded that Dr. Steeb's failure to identify an abscess in the radiology report he prepared caused Mrs. Gallagher's attending physicians, who relied on that report, to be misled.
Dr. Steeb presented an expert report by Jill E. Jacobs, M.D., dated February 7, 1997. Dr. Jacobs asserted that Dr. Steeb rendered an accurate radiological report of Mrs. Gallagher's CAT-scan and conformed to the appropriate standard of care.
In October of 1997, Dr. Jacobs was deposed. During her testimony, Dr. Jacobs suggested, for the first time, malpractice (untreated osteomyelitis) on the part of Drs. Goldstein and Phillips, the physicians who had been treating Mrs. Gallagher for the complications of her surgery. No expert up to that point had expressed any criticism or concern or raised any issue of malpractice against Drs. Goldstein and Phillips or their group.
In December of 1997, Mrs. Gallagher was granted leave to amend her complaint to name Drs. Goldstein and Phillips. The doctors, in turn, moved to dismiss the complaint based on the statute of limitations and the misuse of R. 4:26-4, the fictitious pleading rule. The trial judge denied the motion and allowed Mrs. Gallagher to invoke the discovery rule as a result of Dr. Jacob's belated opinion.
Defendants appeal, contending that R. 4:26-4 did not "save" Mrs. Gallagher's filing after the statute of limitations had run and that Mrs. Gallagher could not rely on the "discovery rule" because the opinion of Dr. Jacobs, an expert witness, did not constitute new "factual information" so as to toll the statute of limitations.
We agree with defendants that R. 4:26-4 is irrelevant to the issue presented. The fictitious defendant rule was promulgated to address the situation in which a plaintiff is aware of a cause of action against a defendant but does not know that defendant's identity. Younger v. Kracke, 236 N.J.Super. 595, 599, 566 A.2d 581 (Law Div. 1989). That is not the case here.
The trial judge correctly ruled that this is a discovery rule case under Lopez v. Swyer, 62 N.J. 267, 300 A.2d 563 (1973). The discovery rule was developed to avoid the "harsh results that would otherwise flow from the mechanical application" of the statute of limitations. Vispisiano v. Ashland Chem. Co., 107 N.J. 416, 426, 527 A.2d 66 (1987). The discovery rule
delays the accrual of a cause of action until the plaintiff learns or reasonably should learn, the existence of that state of facts which may equate in law with a cause of action.
[Apgar v. Lederle, 123 N.J. 450, 455, 588 A.2d 380 (1991) (quoting Vispisiano, supra, 107 N.J. at 426, 527 A.2d 66).] *1260 In Baird v. American Medical Optics, 155 N.J. 54, 66, 713 A.2d 1019 (1998), the Court said:
Critical to the running of the statute is the injured party's awareness of the injury and the fault of another. The discovery rule prevents the statute of limitations from running when injured parties reasonably are unaware that they have been injured, or, although aware of an injury, do not know that the injury is attributable to the fault of another.
The discovery rule operates:
When a party is either unaware that he has sustained an injury or, although aware that an injury has occurred, he does not know that it is, or may be, attributable to the fault of another.
[Tevis v. Tevis, 79 N.J. 422, 432, 400 A.2d 1189 (1979).]
Moreover,
the test is not solely subjective, although it takes into account the plaintiff's knowledge. The question is whether the plaintiff "knew or should have known of sufficient facts to start the statute of limitations running...."
[Mancuso v. Neckles, 316 N.J.Super. 128, 134, 719 A.2d 716 (App.Div.1998) (quoting Baird, supra, 155 N.J. at 72, 713 A.2d 1019).]
The gravamen of defendants' argument, is that because Mrs. Gallagher had all the "facts" of her case by way of the hospital and medical records surrounding her injury, the belated opinion of an expert as to the existence of a cause of action against Drs. Goldstein and Phillips did not operate to extend the limitations period. In support of this view, defendants cite Burd v. New Jersey Tel. Co., 76 N.J. 284, 386 A.2d 1310 (1978), Savage v. Old Bridge-Sayreville Medical Group, 134 N.J. 241, 633 A.2d 514 (1993), and Silverman v. Lathrop, 168 N.J.Super. 333, 403 A.2d 18 (App.Div.1979). A review of these cases reveals that they do not support defendants' position here. In Burd, for example, the court rejected plaintiff's invocation of the discovery rule based upon his late receipt of a medical report linking his occupational use of glue to his heart attack, not because he was in possession of all his medical records, but because
[t]he regular incidence of lightheadedness and dizziness while using the glue, and the disappearance of the symptoms shortly after cessation of plaintiff's exposure thereto, together with the permissible inference from the proofs that plaintiff realized the connection between the glue and the symptoms (although at trial he denied such knowledge), furnishes a substantial credible basis for an inference of knowledge by plaintiff at least shortly after the heart attack that the exposure to the fumes of the glue in the warm trench was in some way related to that attack.
[Burd, supra, 76 N.J. at 292-93, 386 A.2d 1310.]
Likewise, the facts in Silverman were as follows:
In April 1972 Silverman, a 42-year-old chemical engineer employed by a pharmaceutical company, noticed a small dark spot behind his knee which he thought was a blood blister. On July 7, 1972 he first consulted defendant, a dermatologist. Defendant excised the lesion but did not order a biopsy of the removed tissue. In late August or early September, Silverman noticed a black swelling at the incision site. On October 3 he returned to defendant, who then became suspicious that the original lesion had been a melanoma. An excisional biopsy was promptly performed.
The pathological report diagnosing malignant melanoma was received by defendant on October 14. Defendant immediately informed Silverman of the diagnosis and of the need for specialized treatment. On defendant's advice Silverman consulted a specialist, Dr. Steinberg, on October 25 and thereafter had no contact with defendant. Silverman was admitted to Memorial Hospital in New York City on October 31 and underwent surgery on November 17. He was discharged on December 2, 1972 with a "guarded prognosis" because of regional metastases. He was thereafter followed closely by the doctors and in April 1975 a liver scan suggested possible complication. In June 1975 an aspiration biopsy *1261 of the liver was positive for malignant melanoma, a fatal complication.
On learning of his imminently terminal condition Silverman consulted an attorney on June 27, 1975 to order his affairs. The attorney investigated the medical-legal implications of the failure to perform a biopsy following the initial excision on July 7, 1972 and filed this personal injury action on October 31, 1975. Silverman died of alleged metastatic melanoma on December 21, 1975. On February 24, 1976 the present plaintiff, Mrs. Silverman, filed an amended complaint substituting herself as plaintiff in her capacity as executrix and demanded damages for wrongful death as a result of defendant's alleged malpractice.
[Silverman, supra, 168 N.J.Super. at 336, 403 A.2d 18.]
The court rejected Silverman's contention that the statute did not begin to run until he received an expert opinion in 1975, not because he was earlier in possession of all his medical records, but because it found that by December of 1972 when he learned his cancer was metastasized, he was actually aware of all of the implications of his condition and of defendant's possible medical dereliction in not obtaining a biopsy after the first excision.
Savage, supra, 134 N.J. at 243, 633 A.2d 514 was an action for medical malpractice against physicians who had administered a tetracycline derivative to plaintiff in early childhood, discoloring her teeth. Plaintiff became 21 in 1982. Up to that point the statute was tolled by reason of her age. She filed her complaint in 1989 alleging she was unaware until 1988 that her injury was due to the fault of the doctors. The trial judge ruled that because she had all the "facts" (i.e., that her teeth were discolored and that medication given to her as a child might have caused the discoloration) at the time she reached majority, she had only two years to bring suit. We disagreed, 260 N.J.Super. 417, 616 A.2d 1307, reasoning that, while plaintiff was aware that she had suffered injury and that medication was a likely cause of the injury, the record did not reveal that she was or should have been aware that a lack of care in administering the medication was a cause of her condition. Savage, supra, 134 N.J. at 244, 633 A.2d 514.
The Supreme Court agreed, characterizing Savage as a case like Lopez where, although plaintiff was aware of her injury, she was not aware that it was due to her physicians' avoidable fault. Id. at 247, 633 A.2d 514. In so ruling, the Supreme Court distinguished Savage's claims from those of the plaintiff in Apgar v. Lederle Labs., 123 N.J. 450, 588 A.2d 380 (1992) who knew by the time she was 18 years old that the medicine she had taken as a child had discolored her teeth; that that medicine "had not been thoroughly tested"; and that "certain things weren't right." Id. at 453, 588 A.2d 380. Her suit against the manufacturers was time barred.
In other words, the cases turn not wholly upon what records or documents are in a plaintiff's possession, but upon what a reasonable person would make of that material. Burd had every reason to connect his inhalation of glue to his heart attack given his symptoms upon each inhalation. Silverman knew several months after his physician had failed to send an excised mole for biopsy that it was a malignant melanoma. Savage knew the manufacturer of the tetracycline drug could be liable, but had no reason to think her doctors administered the drug wrongly, despite having all her medical records. In each case, the applicability of the discovery rule turned upon whether a reasonable person would have known, based on what occurred and on the records, that his or her injury was due to the fault of another.
To be sure, our cases have properly rejected the view that, in a medical malpractice action, the limitations period does not automatically run until an expert is found to opine that the physician's treatment fell short of the standard. See, e.g., Graves v. Church & Dwight Co., Inc., 115 N.J. 256, 558 A.2d 463 (1989); Brizak v. Needle, 239 N.J.Super. 415, 571 A.2d 975 (App.Div.1990). This is a far cry, however, from suggesting that where the relationship between a plaintiff's injury and a defendant's fault is not self-evident and there is nothing else in the record warranting the conclusion that plaintiff should have made that linkage, that belated *1262 receipt of an expert's report cannot trigger operation of the discovery rule.
All of the cited cases affirm the basic principle of Lopez, supra, 62 N.J. at 274, 300 A.2d 563, and Lynch v. Rubacky, 85 N.J. 65, 70, 424 A.2d 1169 (1981), that where, within the limitations period, a plaintiff knows she has been injured and that her injury is due to the fault of another, she has a duty to act. However, they also stand for the proposition that in a case in which a plaintiff knows she has been injured but fault is not self-evident or implicit in the injury itself, it must be shown that a reasonable plaintiff would have been aware of such fault in order to bar her from invoking the discovery rule. See also Alfone v. Sarno, 139 N.J.Super. 518, 354 A.2d 654 (App.Div.), certif. den., 71 N.J. 498, 366 A.2d 654 (1976). That awareness may first come by way of an expert's opinion.
In a supplemental, filing defendants drew our attention to Mancuso v. Neckles, 316 N.J.Super. 128, 134-35, 719 A.2d 716 (App. Div.1998). The facts in Mancuso as set forth by the court are as follows:
On two occasions, the first in 1988 and the second in 1989, Pia Mancuso, hereinafter referred to as plaintiff, had mammography (radiological studies of the breast) performed at the Montclair Imaging Center. Dr. Beinart, a radiologist, interpreted the films and prepared and signed mammogram reports for plaintiff's physician. In each instance, Dr. Beinart noted the existence of a cyst as a possible abnormality of the right breast and described the cyst as "most likely benign." In the first report, he recommended a follow-up mammogram in six months, and in the second report he recommended another mammography in a year. He had no further involvement with plaintiff.
In June 1991, plaintiff entered Holy Name Hospital for a hysterectomy, which included a mammogram as part of the preoperative work-up. Plaintiff arranged for her 1988 and 1989 mammogram films to be sent to the hospital as a baseline. A radiologist found ovoid densities in the right breast and recommended to plaintiff's surgeon, Spero Neckles, that she undergo a follow-up mammogram in four months. Plaintiff contends that Dr. Neckles failed to advise her of either the abnormal findings or the recommendation for a follow-up in four months. These allegedly abnormal findings and the failure to provide plaintiff with appropriate advice in relation to them formed the initial basis for this civil action.
On July 8, 1992, plaintiff underwent another mammography. The report indicated the cyst identified in the 1988 and 1989 films had not changed, but it also revealed the existence of a suspected malignancy in the right breast in the area of the ovoid densities. Shortly thereafter, the cancer in the right breast, and its extension into eighteen lymph nodes, was confirmed.
Because of the extent of her tumor and metastases to her lymph nodes, plaintiff was confronted with an extremely poor prognosis. Consequently, she underwent an autologous bone marrow transplant and months of debilitating radiation therapy. In December 1992, shortly before the transplant, plaintiff learned for the first time of the abnormality reflected by the June 1991 mammogram and the radiologist's recommendation for a four month follow-up mammogram.
In June 1993, plaintiff consulted counsel with her immediate concern being the failure of Dr. Neckles in June 1991 to advise her of the recommendation for a follow-up mammogram in four months.
Plaintiff certified that at no time did she suspect that her 1988 or 1989 mammogram had been misread.
....
... [P]laintiff's counsel submitted all of plaintiff's mammograms to a radiologist. On June 24, 1994, the radiologist, Stephen V. LoCurcio, M.D., reported that in his opinion there had been malpractice in 1991, not with respect to the reading of the mammogram by that radiologist, but because of the failure of the surgeon to recommend follow-up studies in a timely fashion. However, with respect to Dr. Beinart's interpretations of the 1988 and 1989 mammographies, LoCurcio said, "I agree with ... the ... interpretations and *1263 reports.... I would have reached the same conclusion and [rendered] similar reports as [the] Radiologist!"
[Id. at 130-32, 719 A.2d 716.]
Mancuso sued Neckles, and in the course of that litigation, in April of 1996, a defense expert first opined that the cancer was visible in the 1989 mammogram. Plaintiff's counsel then retained a new expert to review the 1988 and 1989 mammograms. That expert maintained that the cancer was visible on both the 1988 and 1989 mammograms and that Dr. Beinart's interpretation to the contrary constituted malpractice. Mancuso obtained court approval to amend her complaint to add Dr. Beinart. The trial judge dismissed the complaint on Dr. Beinart's motion on the ground that the statute of limitations had run. Mancuso appealed, citing Lopez, supra, 62 N.J. at 273-74, 300 A.2d 563. Another panel of this court affirmed, concluding that:
A reasonable person in plaintiff's position should have been aware that her expert's opinion was not necessarily the last word on the subject of who might have done her wrong. In 1992, plaintiff knew of her injury, the increase in the cancer caused by a delayed diagnosis, and she knew that it had been possibly caused by the negligence of another. A reasonable person would have appreciated that the universe of possible others included any of the radiologists who had read the mammograms. Dr. Beinart was clearly within that universe. Although plaintiff did not know him by name, she had his reports and mammograms, and she could have as easily identified him by name in 1992 or 1993 as she did in 1997.
[Mancuso, supra, 316 N.J.Super. at 134-35, 719 A.2d 716.]
The panel in Mancuso properly identified the controlling legal principles: (1) that the discovery rule delays accrual of a cause of action until plaintiff knows or should know of sufficient facts to start the statute of limitations running; and (2)that where a plaintiff knows of a possible claim and does not act on it, she cannot invoke the discovery rule when her knowledge is finally verified as a cause of action by an expert. We are in full accord with these standards. It is here that we part company from Mancuso. More particularly, we think that its conclusion that Mrs. Mancuso knew or should have known that she had a potential claim against Dr. Beinart is based on the faulty premise that possession of all the medical records surrounding a claimed injury equates with knowledge that the injury may be the fault of another. Not so.
Mrs. Mancuso was not a physician or a radiologist and had no particular skill or ability to read a mammogram. She also had absolutely no symptoms following the original mammograms. When, several years later, she found that her cancer was advanced, she went to a lawyer in a timely fashion and engaged an expert to review her records, including the 1988 and 1989 mammograms to determine whether her injury was the fault of another. Her expert found malpractice in the 1991 interpretation but none in the 1988 and 1989 readings. Mrs. Mancuso thus had absolutely no reason to doubt the 1988 and 1989 mammograms which were not followed by any symptoms, and which were taken and interpreted by one expert and found by a different expert, hired for litigation purposes, to be beyond reproach. The panel's implicit suggestion that to protect herself Mrs. Mancuso had a duty to second-guess her experts or sue Dr. Beinart, although she reasonably believed him to be blameless, does not conform with our understanding of the law. While Mancuso arose before the applicable date of N.J.S.A. 2A:53A-27, we think its reasoning places lawyers and litigants in an untenable position with respect to that statute which requires an Affidavit of Merit by a plaintiff in a professional malpractice case.[3]
Regardless of Mancuso, we think the discovery rule is applicable in the case before us. Here, while Mrs. Gallagher had all the medical records surrounding her injuries, she did not have any reason to believe that Drs. Goldstein and Phillips were at fault. Those doctors, her after-care physicians, were engaged solely to correct the complications which immediately revealed themselves at *1264 the time of her surgery in 1994. The direct correlation between Mrs. Gallagher's original surgery and her symptoms is crucial here because a reasonable person, who continued to suffer from the time of surgery without abatement as Mrs. Gallagher did, would have no reason to believe that the doctors who were trying to remedy the initial malpractice were also at fault. There was absolutely no reason for Mrs. Gallagher to presume that her condition was due to anything but the original malpractice and no one suggested otherwise. The report of her expert indicated no fault on the part of the after-care physicians. That she had no reason to doubt her expert's report is undergirded by the initial defense experts' reports which also omitted any suggestion of malpractice by the after-care physicians.
Whether the plaintiff in Mancuso had reason to second-guess her experts in light of the currency of public discussion on mammography and breast cancer (which probably played a part in that decision) may be open to debate. What is not debatable is that Mrs. Gallagher had absolutely no reason to question Drs. Goldstein and Phillips until Dr. Jacobs testified in October of 1997. She acted promptly thereafter.
Nothing in this decision should be viewed as an opinion on the liability of Drs. Goldstein and Phillips. It may very well be that they are blameless. We hold only that in this case, Mrs. Gallagher met her obligation to investigate fully the facts surrounding her injury including the universe of persons potentially at fault; that nothing in the records would have pointed a reasonable person toward Drs. Goldstein and Phillips; and that the belated opinion of Dr. Jacobs warranted her invocation of the discovery rule.
Affirmed.
WEFING, J.A.D., dissenting.
My colleagues have concluded that the trial court correctly determined that plaintiffs' third amended complaint, filed on December 30, 1997, in which plaintiffs for the first time asserted a claim of professional negligence against Dr. Howard R. Goldstein, Dr. Neil Phillips and Urological Professional Association, is not barred by the statute of limitations. Because I conclude that the statute of limitations expired more than a year before plaintiffs filed that complaint, I am unable to agree and therefore dissent.[4]
Although my colleagues thoroughly set forth this matter's factual background, I consider it necessary to restate certain items so they may be seen in context. On May 19, 1994, Drs. Pagnani and Braga performed surgery on Mrs. Gallagher at Burdette-Tomlin Memorial Hospital (Burdette-Tomlin). Her recovery was not uneventful. She suffered bleeding and persistent pain but received no relief in her follow-up care from Drs. Pagnani and Braga. In August 1994, having obtained no relief and beginning to experience difficulty in walking, she turned to her family physicians, Drs. Maro and Todt. They, in turn, admitted her to West Jersey Hospital (West Jersey) and ordered a urology consultation with Drs. Phillips and Goldstein. As part of this urology consultation, Mrs. Gallagher underwent a CAT scan on August 23, 1994 that was read by a radiologist, Dr. Steeb, the following day. Dr. Steeb's report stated in part:
There is abnormal soft tissue density extending from the lower abdominal wall near the rectus muscle area and extending interiorly to an area just anterior to the urinary bladder. There may also be some thickening of the anterior wall of the urinary bladder. There is some associated destructive changes involving the superior pubic ramus on the right side. Since the patient had previous surgery, this most likely represents inflammatory process with associated osteomyelitis of the pubic bone. Clinical correlation is recommended.
Drs. Phillips and Goldstein diagnosed osteoitis pubis (an inflammation of the pubic bone), prescribed Prednisone, and discharged Mrs. Gallagher on August 25, 1994. Her condition worsened, however, and they readmitted *1265 her to West Jersey on September 7, 1994. A second CAT scan was performed on September 8. This was read by another radiologist who reported that:
[a] large abscess collection is seen just anterior to the urinary bladder.... Pockets of gas are seen.... There is no evidence of free fluid.... Since the last examination, there appears to be worsening of the abscess, which appears larger in size with gas now within it. The abscess is now extended into the labium.
Upon receipt of the report, Drs. Phillips and Goldstein performed surgery to drain the abscess and ordered a course of antibiotic treatment. Mrs. Gallagher was left incontinent. She remains under the care of Drs. Phillips and Goldstein.
She commenced suit on May 23, 1995 and originally named Drs. Pagnani and Braga, Pagnani-Braga Urologic Associates, and Burdette-Tomlin as defendants. She first amended her complaint on October 20, 1995 and added Dr. Steeb and West Jersey as defendants. In April, 1996, she again amended her complaint to add as defendants South Jersey Radiology Associates, Dr. Weisberg, and Cape Emergency Physicians. (Mrs. Gallagher had seen Dr. Weisberg several days after the initial surgery when she experienced bleeding, fever and chills; she went to the emergency room at Burdette-Tomlin and was seen by Dr. Weisberg, the emergency room physician on duty.)
In the course of this litigation, Mrs. Gallagher has served the reports of two experts, Dr. Howard Simon and Dr. Seymour Piwoz. Dr. Simon is a board-certified urologist. After reviewing all of Mrs. Gallagher's medical records, he issued a report dated September 5, 1995, in which he opined that Mrs. Gallagher's post-operative care deviated from the accepted standards of medical practice as a result of which she developed an infection that went undiagnosed and that led in turn to her injuries. Within that report, Dr. Simon expressed the further opinion that "the actual diagnosis of abscess was missed on 8-23-94 on the CT scan, which resulted in another two weeks before the true diagnosis and the significant extension of the abscess was noted." Dr. Piwoz is a radiologist. Within his report, which is dated February 15, 1996, he expressed the opinion that the failure to diagnose the abscess on the August 23, 1994 CAT scan was a deviation from the accepted standards of radiologic care.
Dr. Simon was deposed on September 18, 1997. He expressed the view that the failure to note the abscess on the August 23, 1994 film caused Dr. Phillips and Dr. Goldstein to prescribe Prednisone, which was an inappropriate treatment because it is ineffective against infection.
Dr. Jacobs, Dr. Steeb's expert, was deposed on October 17, 1997. She expressed the view that Dr. Steeb did not deviate from accepted standards of radiologic care. Because the August 23, 1994 film revealed, in her opinion, osteomyelitis rather than an abscess, Dr. Jacobs expressed the view that Drs. Phillips and Goldstein committed malpractice by failing to treat this condition for several weeks.
Plaintiffs then sought leave to amend their complaint to add Drs. Phillips and Goldstein as defendants; the trial court granted plaintiffs' motion. Drs. Phillips and Goldstein subsequently moved to dismiss the complaint against them as having been filed beyond the statute of limitations; the trial court denied their motion. We granted leave to appeal.
My colleagues hold that plaintiffs' cause of action against Drs. Phillips and Goldstein is saved by the discovery rule. I have no quarrel with the case law regarding the nature and purpose of the discovery rule which my colleagues cite, and I will not restate it here. My review of the record, however, discloses absolutely no basis to invoke the discovery rule in this matter. The trial court and my colleagues treat an opinion expressed by a defendant's expert as a newly-discovered fact, of which plaintiff could not have been aware in a timely fashion. It is not a "fact" at all, however. It is merely an opinion reached by one expert after reviewing Mrs. Gallagher's medical records and certain discovery material. Plaintiffs' expert reached a contrary opinion after reviewing those same medical records.
The distinction between factual evidence and opinion evidence is fundamental. A fact *1266 is "an action performed, an event, an occurrence, or a circumstance." Garner, A Dictionary of Modern Legal Usage p. 346 (2d ed.1995); 35 C.J.S. pp 490 to92 (1960). Facts serve as the bases from which experts draw conclusions and opinions. Brandt v. Medical Defense Associates, 856 S.W.2d 667, 673 (Mo.1993). Thus, whether a physician made a certain disclosure to his patient is a question of fact; the sufficiency of the disclosure is a matter of opinion. Kaplan v. Haines, 96 N.J.Super. 242, 252 n. 1, 232 A.2d 840 (App.Div.1967), aff'd o.b., 51 N.J. 404, 241 A.2d 235 (1968), overruled on other grounds, Largey v. Rothman, 110 N.J. 204, 540 A.2d 504 (1988). Opinions that are not grounded in facts are not admissible in evidence. Dawson v. Bunker Hill Plaza Assoc., 289 N.J.Super. 309, 323, 673 A.2d 847 (App.Div.), certif. denied, 146 N.J. 569, 683 A.2d 1164 (1996).
If we accord plaintiffs the benefit of the discovery rule in this situation, we deny these defendants the protection of the statutory limitations period to which they are entitled. Moreover, we entirely ignore the well-established principle that accrual of a cause of action for professional negligence is not postponed until a corresponding expert opinion is obtained. Brizak v. Needle, 239 N.J.Super. 415, 426-27, 428, 571 A.2d 975 (App.Div.), certif. denied, 122 N.J. 164, 584 A.2d 230 (1990). The logical consequence of extending the discovery rule to the instant situation is to obviate the two-year period of limitations for all medical malpractice litigation.
In their brief to us, plaintiffs partly rely on what they characterize as the trial court's factual determination that certain discovery delays created by defendants impeded their ability to inculpate Drs. Phillips and Goldstein within the statutory period. We have not been provided however with any material in connection with this appeal that would support such a conclusion. The only additional material plaintiffs obtained prior to filing their complaint against Drs. Phillips and Goldstein was the opinion of Dr. Steeb's expert, Dr. Jacobs, who stressed the failure of these doctors initially to treat Mrs. Gallagher's osteomyelitis. The doctors' decision in that regard, however, was immediately apparent to anyone reviewing her medical records for Dr. Steeb's radiology report of August 24, 1994 refers to the presence of osteomyelitis. The discovery rule is simply inapplicable in this context.
This is not a case in which plaintiff were unaware of the identity of these doctors or the treatment they provided. Mrs. Gallagher's complete medical records were available to her; indeed, those records were sent out for review by a board-certified urologist who expressed no criticism of the treatment rendered by Drs. Phillips and Goldstein. By September 1994, Mrs. Gallagher knew the extent of her injuries and the facts of her treatment. The statute of limitations began to run at that point. Because plaintiffs' complaint against Drs. Phillips and Goldstein was filed well beyond the period of limitations, I would reverse the trial court's order and dismiss the complaint against them.
NOTES
[1] Plaintiff's husband Thomas sued per quod.
[2] "An operation performed to alleviate stress incontinence, performed retropubically." Stedman's Medical Dictionary (5th ed. 1982). That is, an operation to correct the inability to prevent the discharge of excretions (e.g., urine or feces) performed behind the external genitals.
[3] This case also arose before the applicable date of N.J.S.A. 2A:53A-27.
[4] Within their opinion, my colleagues find that plaintiffs are not entitled to the benefit of the relation-back doctrine through their use of fictitiously-named defendants in their original pleadings. I concur with that conclusion.